1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL BLAKE RANDOLPH Derivatively on Behalf of ZILLOW GROUP, INC., <br><br>           Plaintiff, <br><br>      v. <br><br> RICHARD N. BARTON, ERICK BLACHFORD, AMY BOHUTINKSY, CLAIRE CORMIER THIELKE, LLOYD FRINK, JAY HOAG, GREGORY MAFFEI, GORDON STEPHENSON, APRIL UNDERWOOD, ALLEN W. PARKER, JEREMY WACKSMAN, AND DAN SPAULDING, ARIK PRAWER, AIMEE JOHNSON, SUSAN DAIMLER, AND DAVID BEITEL, <br><br>           Individual Defendants, <br><br> -and- <br><br> ZILLOW GROUP, INC., a Washington Corporation, <br><br>           Nominal Defendant. | NO. <br><br> VERIFIED STOCKHOLDER DERIVIATIVE COMPLAINT |

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Plaintiff Michael Blake Randolph ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for violations of securities laws, breach of fiduciary duty, waste of corporate assets, unjust enrichment, and insider trading. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## I.       NATURE AND SUMMARY OF THE ACTION

1.       This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Zillow Group, Inc. ("Zillow" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Zillow's reputation, goodwill, and standing in the business community and has exposed Zillow to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Zillow in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.       Zillow is a real-estate marketplace company that was founded in 2006.

3.       This action seeks to remedy wrongdoing committed by Zillow's directors and officers from February 10, 2021 through the present (the "Relevant Period").

4.       From February 10, 2021 through November 2, 2021, the Individual Defendants caused the Company to issue materially false and misleading statements regarding Zillow Offers.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 2
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

5.      The Defendants created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently-discussed and highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements. Specifically, the statements made were further materially false and misleading because: (i) Zillow management overrode the offer prices generated by Zillow's algorithms and pricing analysts, and significantly increased the prices Zillow Offers would pay for homes in order to entice more home sellers to accept offers to meet Zillow's volume goals. In the April to May 2021 time frame, Individual Defendants initiated or knew of Project Ketchup to quickly ramp up the purchases of homes; (ii) Individual Defendants claimed operational, unit economic, or renovation "improvements" were the result of non-durable and unsustainable slashing of renovation scopes and the amounts Zillow would pay contractors; (iii) in April or May 2021, Individual Defendants began decreasing the scope of its renovations and the prices it would pay contractors for those renovations; (iv) renovation cost-cutting and the squeeze on contractors came at a time when Zillow was relying on those contractors to quickly renovate a significantly higher volume of houses acquired by overpaying for homes using price overlays and, as a result, Zillow's contractors began deprioritizing Zillow renovations or declining jobs altogether due to Zillow's actions; (vi) the Individual Defendants hid from the stockholders the increased risk it took on by deliberately over-paying for homes well beyond the prices set by its algorithms and analyst pricing; and (vii) the Individual Defendants failed to maintain an adequate system of internal controls. As a result of the foregoing, Zillow's inventory kept growing and contractors did not complete projects on time or agreed to less projects and this caused houses to sit in inventory longer. When houses sit in Zillow's inventory longer, the cost

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 3
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

to Zillow rises.

6.     Zillow's new iBuying business, which it called Zillow Offers, provided the Company with a brand-new revenue source to revive its decelerating revenue streams. Zillow initially launched Zillow Offers in two test markets, but by the end of 2018, Zillow had expanded its iBuying operations to five metropolitan areas.

7.     In early 2020, after the COVID-19 pandemic began, the Company paused its Zillow Offers home purchases, which slowed its growth trajectory for 2020. But by the second quarter of 2021, Zillow Offers was expanding again, so much so that Zillow Offers made up roughly 60% of Zillow's total revenues.

8.     The Company saw many issues regarding Zillow Offers, including missing annual targets. Yet the Defendants claimed all was well. In order to keep the façade going, the Defendants chose to double down and purchase even more homes at prices above what its algorithm and analysts considered market value. It worked, by the third quarter of 2021, Zillow had again more than doubled its home purchases.

9.     Unbeknownst to the public, the Company was sacrificing money it had available for renovations in order to buy up more inventory which caused down the line issues with contractors. As a result, Zillow's contractors could no longer be profitable given the narrowed scopes and lowered pricing, they began declining jobs and refusing to work for the Company. Without enough contractors to complete renovations, Zillow's increasing volume of homes were idle and by July the Company had built up a substantial backlog of homes that needed to be renovated. This renovation inventory backlog impacted Zillow's ability to quickly sell its homes, thereby drastically increasing its costs.

10.     Nevertheless, the Defendants touted how successful Zillow Offers was during

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 4
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the Relevant Period while failing to disclose that the Company's operations artificially altered results in order to buoy the stock. The Defendants knew the Company was failing to adequately asses date in order manage inventory properly.

11.    The truth began to emerge in October 2021 when Zillow announced a moratorium on new contracts in the Zillow Offers division for the remainder of the year.

12.    The full truth was revealed when in November 2021, Zillow reported that Zillow Offers lost close to $400 million and that the Company was winding down the segment over the next several quarters. The Company admitted that its home valuation process was inadequate and that, as a result, Zillow would be forced to unload thousands of properties at drastically reduced prices.

13.    In February 2022, the Company reported additional losses amounting to more than $880 million in the Zillow Offers division.

14.    The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.    As detailed herein, and as alleged in the ongoing federal securities class action in the Western District of Washington styled *Barua et al. v. Zillow Group et al.*, Case No. 2:21-cv-1551, (the "Federal Securities Class Action"), Zillow's officers and directors substantially damaged the Company by filing materially false and misleading statements.

## II.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 5
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

18.    Venue is proper in this District because the Company is incorporated in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this District.

## III.    THE PARTIES

### A.    Plaintiff

19.    Plaintiff is and has continuously been a stockholder of Zillow during the wrongdoing complained of herein.

### B.    Nominal Defendant

20.    Defendant Zillow is a Washington corporation with its principal executive offices at 1301 Second Avenue, Floor 31, Seattle, Washington 98101. Zillow's Class A common stock trade on the Nasdaq under the ticker symbol "ZG." Zillow's Class C capital stock trades on the Nasdaq under the ticker symbol "Z."

### C.    Individual Defendants

21.    Defendant Richard N. Barton ("Barton") has served as the Company's CEO

since 2014 and as a director since 2004. He previously served as CEO from 2004 until 2010 and Executive Chairman from 2010 until 2019. During the Relevant Period, Barton made the following sales of stock:

| Date | Class | Shares | Price (Average) | Proceeds |
|------|-------|--------|-----------------|----------|
| 3/1/2021 | A | 43,750 | $175.61 | $7,669,929.04 |
| 3/1/2021 | C | 87,500 | $167.38 | $14,624,790.28 |
| 3/8/2021 | C | 94,046 | $130.78 | $12,036,849.91 |
| 3/16/2021 | C | 343,940 | $149.69 | $51,218,779.33 |
| Total Proceeds: | | | | $85,550,348.56 |

22.     Defendant Erick Blachford ("Blachford") has served as a Company director since May 2005. During the Relevant Period, Blachford made the following sales of stock:

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 2/24/2021 | A | 4,602 | $174.87 | $804,766.01 |
| 2/24/2021 | C | 9,204 | $167.25 | $1,539,402.13 |
| Total Proceeds: | | | | $2,344,168.14 |

23.     Defendant Amy Bohutinsky ("Bohutinsky") has served as a Company director since October 2018.

24.     Defendant Claire Cormier Thielke ("Thielke") has served as a Company director since October 2020. Thielke serves as a member of the Audit Committee.

25.     Defendant Lloyd Frink ("Frink") has served as a Company director since December 2004, as President since February 2005, and as Executive Chairman since February 2019.

26.     Defendant Jay Hoag ("Hoag") has served as a Company director since October 2005.

27.     Defendant Gregory Maffei ("Maffei") has served as a Company director since May 2005. Maffei serves as Chair of the Audit Committee. On March 2, 2021, Maffei sold

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 7
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

2,296 shares of Class C capital stock for total proceeds of $380,864.

28.     Defendant Gordon Stephenson ("Stephenson") has served as a director since May 2005. Stephenson serves as a member of the Audit Committee. On February 18, 2021, Stephenson sold 11,004 shares of Class C capital stock for total proceeds of $1.989 million.

29.     Defendant April Underwood ("Underwood") has served as a director since February 2017.

30.     Defendant Allen W. Parker ("Parker") has served as the Company's CFO since November 2018. On May 25, 2021, Parker sold 15,000 shares of Class C capital stock for total proceeds of $1.725 million.

31.     Defendant Jeremy Wacksman ("Wacksman") has served as the Company's Chief Operating Officer since February 2021. Prior to that, he served as President of Zillow from December 2019 to February 2021. During the Relevant Period, Wacksman made the following sales of stock:

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 3/1/2021 | A | 252 | $175 | $44,100.00 |
| 3/1/2021 | C | 504 | $165.27 | $83,296.08 |
| 8/27/2021 | A | 500 | $99.35 | $49,675.00 |
| 8/27/2021 | C | 1,000 | $99.68 | $99,680.00 |
| **Total Proceeds:** | | | | **$276,751.08** |

32.     Defendant Dan Spaulding ("Spaulding") has served as Chief People Officer since April 2016. During the Relevant Period, Spaulding made the following sales of stock:

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 8/31/2021 | C | 26,640 | $96.62 | $2,573,983.44 |
| 9/1/2021 | C | 58,848 | $96.62 | $5,685,623.06 |
| **Total Proceeds:** | | | | **$8,259,606.50** |

33.     Defendant Arik Prawer ("Prawer") has served as President of Zillow's Homes Division since December 2019. Prawer previously served as President, Homes Division and

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Co-Head of Zillow Offers from June 2018 to December 2019, and Chief Business Development Officer from February 2018 to June 2018. Although Prawer's LinkedIn profile lists that he still works as Zillow's President, Homes Division, he is no longer listed on the Company's leadership team page on its website and was not mentioned in the proxy statement filed April 28, 2022, the proxy statement did state that the wind down of Zillow Offers is expected to continue into the second half of 2022. During the Relevant Period, Prawer made the following sales of stock:

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 2/26/2021 | C | 800 | $159.46 | $127,566.00 |
| 2/26/2021 | C | 1,555 | $157.81 | $245,393.77 |
| 2/26/2021 | C | 4,930 | $158.82 | $782,959.43 |
| 8/23/2021 | C | 7,416 | $96.43 | $715,124.88 |
| 4/5/2021 | C | 6,601 | $135.66 | $895,491.66 |
| 4/6/2021 | C | 3,606 | $140.55 | $506,823.30 |
| 5/24/2021 | C | 1,817 | $113.03 | $205,384.41 |
| 5/24/2021 | C | 2,200 | $111.25 | $244,742.08 |
| 5/24/2021 | C | 3,056 | $112.23 | $342,970.91 |
| 6/24/2021 | C | 6,600 | $121.08 | $799,128.00 |
| **Total Proceeds:** | | | | **$4,865,584.44** |

34.    Defendant Aimee Johnson ("Johnson") has served as the Company's Chief Marketing Officer since 2018, according to the proxy statement filed April 21, 2021 and her LinkedIn profile. During the Relevant Period, Johnson made the following sales of stock:

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 2/18/2021 | C | 12,375 | $183.47 | $2,270,392.99 |
| 8/24/2021 | C | 3,060 | $97.48 | $298,301.65 |
| 5/24/2021 | C | 12,036 | $113.89 | $1,370,758.38 |
| **Total Proceeds:** | | | | **$3,939,453.01** |

35.    Defendant Susan Daimler ("Daimler") has served as President of Zillow since February 2021. On September 8, 2021, Daimler's spouse sold 23,309 shares of Class C capital stock for total proceeds of $2.219 million.

1

2

3

36.      Defendant David Beitel ("Beitel") has served as Chief Technology Officer since

February 2005. During the Relevant Period, he made the following sales of stock:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

| Date | Class | Shares | Price | Proceeds |
|------|-------|--------|-------|----------|
| 3/2/2021 | C | 214 | $168.85 | $36,134.50 |
| 3/2/2021 | C | 1,155 | $168.02 | $194,060.79 |
| 3/2/2021 | C | 3,206 | $166.79 | $534,739.32 |
| 3/2/2021 | C | 4,775 | $165.97 | $792,513.91 |
| 4/1/2021 | C | 156 | $136.64 | $21,315.06 |
| 4/1/2021 | C | 520 | $134.38 | $69,878.69 |
| 4/1/2021 | C | 792 | $135.65 | $107,436.78 |
| 4/1/2021 | C | 1,542 | $132.64 | $204,531.81 |
| 4/1/2021 | C | 1,990 | $133.57 | $265,794.55 |
| 5/3/2021 | C | 250 | $127.33 | $31,833.00 |
| 5/3/2021 | C | 300 | $130.69 | $39,207.63 |
| 5/3/2021 | C | 300 | $129.69 | $38,908.02 |
| 5/3/2021 | C | 650 | $128.80 | $83,719.74 |
| 5/3/2021 | C | 950 | $126.29 | $119,978.35 |
| 5/3/2021 | C | 1,150 | $124.35 | $143,002.50 |
| 5/3/2021 | C | 1,400 | $125.17 | $175,244.16 |
| 6/1/2021 | C | 3,149 | $113.77 | $358,257.95 |
| 6/1/2021 | C | 1,000 | $114.44 | $114,439.30 |
| 6/1/2021 | C | 400 | $115.76 | $46,304.00 |
| 6/1/2021 | C | 200 | $117.01 | $23,402.50 |
| 6/1/2021 | C | 200 | $118.05 | $23,609.50 |
| 6/1/2021 | C | 51 | $118.74 | $6,055.89 |
| 7/1/2021 | C | 3,668 | $120.98 | $443,746.57 |
| 7/1/2021 | C | 388 | $122.35 | $47,471.30 |
| 7/1/2021 | C | 843 | $123.42 | $104,044.66 |
| 7/1/2021 | C | 101 | $124.10 | $12,533.60 |
| 8/5/2021 | C | 3,670 | $110.35 | $404,992.21 |
| 8/5/2021 | C | 1,330 | $111.13 | $147,805.29 |
| **Total Proceeds:** | | | | **$4,590,961.57** |

22

23

24

37.      Collectively, Individual Defendants Thielke, Maffei, and Stephenson, are

referred to herein as the "Audit Committee Defendants."

25

26

27

38.      Collectively, Individual Defendants Barton, Blachford, Bohutinsky, Thielke,

Frink, Hoag, Maffei, Stephenson, Underwood, Parker, Wacksman, Spaulding, Prawer, Johnson,

Daimler, and Beitel, are referred to herein as the "Individual Defendants."

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 10
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

39.     The Individual Defendants, because of their positions with Zillow, possessed the power and authority to control the contents of Zillow's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Individual Defendants' False and Misleading Statements

*February 10, 2021 Earnings Call*

40.     On February 10, 2021, Barton and Parker, among others participated in an earnings call to discuss the Company's full year and fourth quarter 2020 financial results. During the call, Barton called Zillow Offers a "burgeoning sell side business" in part because of how "durable" it is. Barton further stated, in relevant part, that:

> Our financing arm, Zillow Home Loans, nearly tripled its originations revenue in 2020 compared to 2019. We expanded Zillow Closing Services to 25 markets in less than 12 months, and a vast majority of our customers are now choosing to close with us when purchasing a home from Zillow Offers. This execution resulted in total revenue growth of 22%, which when combined with a disciplined approach to managing costs, resulted in more than $300 million in incremental EBITDA profit generation across the company as compared to 2019.

41.     On February 25, 2021, Zillow began using the Zestimate, Zillow's estimate of a

property's market value.

***February 12, 2021 – 2020 10-K***

42.    On February 12, 2021, Zillow filed Form 10-K for the period ended December 31, 2021 (the "2020 10-K"). The 2020 10-K was signed by Defendants Barton, Parker, Frink, Bohutinsky, Blachford, Hoag, Maffei, Stephenson, Thielke, and Underwood. Appended to the 2020 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Barton and Parker, attesting that "the information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

43.    The 2020 10-K touted Zillow Offers' financial results:

***For Sellers*** – We launched Zillow Offers in April 2018 to provide homeowners with the ability to receive cash offers to purchase their home, giving sellers peace of mind, control and convenience in one of the most stressful transactions of their lives. We have the potential to connect sellers who do not qualify for or accept an offer from Zillow with a trusted local Premier Agent partner. When we buy a home from a seller, our title and escrow business, Zillow Closing Services, performs their due diligence for a clean title and a seamless close of the home transaction. Then, our renovation teams perform light, make-ready repairs to swiftly list the home. As of December 31, 2020, Zillow Offers was available in 25 markets and accounted for $1.7 billion of our revenue for the year, up from $1.4 billion in revenue for the year ended December 31, 2019. This reflects less than 0.1% of the estimated annual U.S. real estate transaction value. For the year ended December 31, 2020, we purchased 4,162 homes from sellers.

***For Buyers*** – When a buyer is ready to meet with a local real estate professional after searching for a home on our mobile applications and websites, we typically connect them with a Premier Agent partner. For customers who are focused on buying new construction homes, we connect them with our home builder partners. Home buyers are also able to purchase homes that are listed for resale through Zillow Offers. For the year ended December 31, 2020, home buyers purchased 5,337 homes through Zillow Offers. Beginning in 2019, home buyers have been able to facilitate a seamless transaction with the adjacent title and escrow services through Zillow Closing Services.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

44.     The 2020 10-K also touted Zillow Offers' competitive advantage: "*Inimitable living database of homes and superior data science and technology advantages… These data and models also provide the foundation for our pricing algorithms for Zillow Offers, although substantially more home-specific information is incorporated to further refine the valuation for this application.*" Regarding the Zestimate's competitive advantages, the 2020 10-K stated that:

> Our living database of more than 135 million U.S. homes is the result of more than 15 years of substantial investment, sophisticated economic and statistical analysis and complex data aggregation of multiple sources of property, transaction and listing data, including user updates to more than 34 million property records. This data is the foundation of our proprietary Zestimate, Rent Zestimate, Zestimate Forecast and Zillow Home Value Index. In 2019, we released a new, more accurate Zestimate, incorporating key learnings from the two-year, global Zillow Prize competition. The improved Zestimate currently has a median absolute percent error of 1.8% for homes listed for sale and 7.4% for off-market homes.

### May 4, 2021 10-Q for Q1 2021 Results

45.     On May 4, 2021, the Company filed Form 10-Q for the period ended March 31, 2021. Appended to the May 4, 2021 10-Q as an exhibit was a signed certification pursuant to SOX by Defendants Barton and Parker, attesting that "the information contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

46.     The May 4, 2021 10-Q assuaged the public's concerns about Zillow Offers by attributing any slowing of growth in Zillow Offers to low inventory buildup due to the pandemic. Then, the May 4, 2021 10-Q represented that the division would have an increase in revenue in future periods:

> Homes segment revenue decreased 9% to $704.2 million, primarily due to a decrease of $68.1 million, or 9%, in Zillow Offers revenue. Zillow Offers revenue declined to $701.0 million due to the sale of 1,965 homes at an average selling price of $356.7 thousand per home, as compared to the sale of 2,394 homes at an average selling price of $321.3 thousand per home in the

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 13
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

comparable prior year period. While we have resumed home buying in all Zillow Offers markets following our temporary pause in the first half of 2020, we are continuing to rebuild our inventory available for resale. We expect Zillow Offers revenue to increase in future periods as we expect to continue to increase our home buying and home selling activities across all markets.

47.     The May 4, 2021 10-Q also assured the stockholders that the Company's internal controls regarding disclosures were effective:

> ***Evaluation of Disclosure Controls and Procedures***
> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Management, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b) as of March 31, 2021. Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that these disclosure controls and procedures were effective as of March 31, 2021.

***May 4, 2021 Q1 2021 Earnings Call***

48.     On May 4, 2021, Defendants Parker and Barton, among others, attended an earnings call to discuss the Company's first quarter 2021 results. During the call, Barton continued to state that slowing growth in Zillow Offers was from the pandemic:

> Our top-of-funnel engagement with our customers translated into excellent results across Zillow suite of products and services. Our flagship buy side business, Zillow Premier Agent, once again generated the strongest results we've ever seen, reporting 38% revenue growth year-over-year in Q1. Our nascent sell-side business, Zillow Offers, continued to accelerate out of the pause we instituted in the pandemic, generating over $700 million in revenue and surpassing our internal expectations on revenue, EBITDA and unit level economics…

49.     Barton then claimed that "Zillow 2.0" was well received by customers:

> Pursuit of these growth opportunities deserves continued appropriate reinvestment of profits. As part of that journey, we recently launched a new advertising campaign with the tagline To Move is to Grow. We think it wonderfully captures the essence of why moving is both exciting and daunting, and how we at Zillow are increasingly able to help our customers navigate this crossing. The campaign supports the expedition we are on as a company as well. Just as we've been reorienting our employees and mission around transactions, we have the exciting task of reeducating our customers on who the new Zillow is and what we can do for them. Every signal we see based on data and customer

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 14
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

feedback is that customers expect and demand a more seamless experience. This is                                     Zillow                                     2.0.

A great example of our customers' enthusiasm for ease is the reaction to our recent announcement that many homeowners in Zillow Offers markets now can see that their Zestimate is a live initial offer from Zillow. The announcement press alone drove record-breaking interest in the service with requests coming in at levels we've never seen before.

### August 5, 2021 Q2 2021 Earnings Results and Outlook

50.     On August 5, 2021, the Company issued a press release that reported its Q2 2021 financial results which included Zillow Offers' revenue of $772 million, accounting for nearly 60% of total Company revenue. The press release quoted Barton, "Of particular note, our iBuying business, Zillow Offers, continues to accelerate as we offer more customers a fast, fair, flexible and convenient way to move. Zillow Offers is proving attractive to sellers even in this sizzling-hot seller's market." The Company's August 5, 2021 shareholder letter gave an outlook of total revenue of $1,927 million to $2,047 million and Homes segment revenue of $1,400 million to $1,500 million for the three months ended September 30, 2021.

51.     The Company also issued a shareholder on the same day, which included a segment regarding Homes Segment:

As we previously discussed, the strong customer demand for Zillow Offers at the start of the quarter continued to accelerate in Q2, resulting in the purchase of 3,805 homes and sale of 2,086 homes. The record number of homes purchased was more than double that of Q1 2021 and is a direct reflection of the customer value proposition, the progress we have made in strengthening our pricing models and automation when providing offers to customers. These drivers resulted in rapid gains in our customer conversion rate from requested offers to signed agreements, which drove inventory to more than double from the end of Q1, with 3,142 homes in inventory at the end of Q2.

***

We expect homes that we purchase to have tighter pricing assumptions closer to our self-imposed guardrails of +/1 200 basis points before interest expense over the course of the second half of the year.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 15
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2

3

*August 5, 2021 Q2 2021 Earnings Call*

4

52.     On August 5, 2021, Parker and Barton, among others, participated in an earnings

5

call to discuss the Company's Q2 2021 financial results. During the call, Barton stated, in

6

relevant part:

7

> On the sell side, Zillow offers continued to accelerate in Q2 with a record 3,805
> homes purchased. We sold 2,086 homes, generating a record $777 million in
> revenue in our Home segment, surpassing our internal expectations for both
> revenue and EBITDA. Importantly, the Zillow Offers value proposition of a fast,
> fair, flexible and convenient close has proved more than durable even in the
> sizzling hot sellers' market…

8

9

10

11

> As we discussed on our last call, we entered Q2 with strong customer interest in
> ZO, which accelerated throughout the quarter and into Q3. Allen will get into
> more details. But as we said on our Q1 call, we saw significant customer
> demand at the beginning of Q2 that we expected would drive revenue growth on
> a lagged basis in Q3, which is now leading to our strong Q3 outlook. And we
> continued to see strong growth in customer demand as we entered Q3 that we
> expect will favorably impact revenue in future quarters. With that in mind, we
> are focused on making progress automating key workflows in support of
> building a large-scale operation.

12

13

14

15

16

17

53.     Barton then touted the strong Zillow Offers' pricing models:

18

> As I said above, we are now back on track with our original objective to
> purchase 5,000 homes per month and to generate annualized revenue of $20
> billion within the original 3- to 5-year time line. For Zillow Home loans, we are
> also on course to achieve our stated goal of 3,000 mortgages originated per
> month within the original time frame we set. Today, we are seeing more and
> more signals from our customers that validate our integration thesis and growth
> strategy.

19

20

21

22

54.     Barton proclaimed his excitement for Zillow Offers, "I confess to being quite

23

excited by how well Zillow Offers is doing in such a hot sellers' market…"

24

55.     During the same call, Parker stated that "Growth in Zillow Offers continued to

25

accelerate in Q2 and exceeded our expectations, with 2,086 homes sold, driving $777 million in

26

Home segment revenue." Parker also attributed Zillow Offers' performance to improvements in

27

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 16
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the segments' renovation costs, among other things, "[w]e also note that the 353 basis point improvement from a year ago in renovation, holding and selling costs, were largely durable operational improvements." Regarding third quarter Homes segment revenue, Parker stated, in relevant part:

> In Q3, we expect our Homes segment revenue to increase sequentially from Q2 to $1.45 billion at the midpoint of our outlook range. This step-up in pace demonstrates our confidence in our ability to scale, resulting from the progress we have made in strengthening our pricing models and automating the top of the funnel.

***August 5, 2021 10-Q for Q2 2021***

56.     On August 5, 2021, the Company filed Form 10-Q for the period ended June 30, 2021. Appended to the August 5, 2021 10-Q as an exhibit was a signed certification pursuant to SOX by Defendants Barton and Parker, attesting that "the information contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

57.     The August 5, 2021 10-Q assured the public that the Company's internal controls regarding disclosures were effective:

> ***Evaluation of Disclosure Controls and Procedures***
>
> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Management, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b) as of June 30, 2021. Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that these disclosure controls and procedures were effective as of June 30, 2021.

***September 13, 2021 Piper Sandler 2021 Virtual Global Technology Conference***

58.     On September 13, 2021, Wacksman participated on Zillow's behalf in the Piper Sandler 2021 Virtual Global Technology Conference. Wacksman had the following exchange

with a Piper Sandler analyst regarding Zillow Offers' positive impact on the Company:

> Analyst: Super. Okay. Let's switch gears and talk a little bit about the Zoffers business. And I think the company was able to really effectively rebuild inventory in the second quarter. And this was more of a challenge in 1Q. Maybe you could talk a little bit about what changed in the interim and how the company is getting better able to react to the current pricing environment with sharply rising prices.

> Wacksman: Yes. I mean you hit on it. Some of the inventory growth timing was just based on the fastest home price appreciation we -- any of us had ever seen before and much stronger than both our internal and other third-party forecast we're seeing at the beginning of the year. So keeping up with rising home price appreciation, both on our acquisition side and then finding that price in the markets we're in, that continue to be a new and unique challenge coming out of pandemic.

> But I will say what we've learned is that this business, Zillow Offers, is a business that exists across all housing market cycles, right? And that's been a question that we've touched on over the past few years. Is Zillow Offers more interesting in a hot or a cold or a medium market? Zillow Offers is a really interesting opportunity for our customers in all markets.

> Now what customers may value continues to shift, right? In a super hot market, it's not as hard to sell your house, yet we're still seeing record demand for Zillow Offers and services like us. And why is that? It's because customers -- those same customers are struggling to buy. And they need to fix and get the certainty of selling so they can both go -- go be a competitive buyer in a hot market, right?

> Now in a cooling market, maybe that's not as much their focus, but the certainty is. And then underlying all that is the convenience factor of you have to live in this asset while you try and sell it and move. So we were really encouraged to see while we saw these incredibly hot markets, the strength and the appeal for Zillow Offers just continues to grow, and we're even more confident now that this is going to be a service really in all weather markets.

59.     The analyst then focused on the economics of Zillow Offers:

> Analyst: Absolutely. So getting the economics right at the unit level is really paramount for this business to be successful and to hit the kind of the long-term margin targets that you've laid out. Kind of -- can you talk about that? How are you feeling about the ability to profitably run the business, especially on some of those line items below gross profit at the unit level?

> Wacksman: Yes. It's a good question. And we talk about wanting to run the business at a plus or minus 200 basis point guardrail on the unit level. And in Q2, we saw unit economics of nearly 600 basis points, I think 576 basis points. And so yes, a good chunk of that is home price appreciation, right, in the market. And you saw that in HPA itself, but also in kind of holding costs correlated with the velocity of sale.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 18
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

But some of those unit economic improvements are durable, right? The work we're doing on more dynamic renovations, the work we're doing on selling costs as our homes brokerage improvements roll out more gradually, you're going to see us book those improvements as unit economic savings to the unit and be able to pass those back on to the customer and eventually to the bottom line.

60.     The Individual Defendants failed to disclose material problems with Zillow Offers.

61.     The Individual Defendants failed to disclose that the Company created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently discussed and highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements.

62.     The statements made were further materially false and misleading because: (i) Zillow management overrode the offer prices generated by Zillow's algorithms and pricing analysts, and significantly increased the prices Zillow Offers would pay for homes in order to entice more home sellers to accept offers to meet Zillow's volume goals. In the April to May 2021 time frame, Individual Defendants initiated or knew of Project Ketchup to quickly ramp up the purchases of homes; (ii) Individual Defendants claimed operational, unit economic, or renovation "improvements" were the result of non-durable and unsustainable slashing of renovation scopes and the amounts Zillow would pay contractors; (iii) in April or May 2021, Individual Defendants began decreasing the scope of its renovations and the prices it would pay contractors for those renovations; (iv) renovation cost-cutting and the squeeze on contractors came at a time when Zillow was relying on those contractors to quickly renovate a significantly higher volume of houses acquired by overpaying for homes using price overlays and, as a result, Zillow's contractors began deprioritizing Zillow renovations or declining jobs altogether

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 19
(NO. )

due to Zillow's actions; (vi) the Individual Defendants hid from the stockholders the increased risk it took on by deliberately over-paying for homes well beyond the prices set by its algorithms and analyst pricing; and (vii) the Individual Defendants failed to maintain an adequate system of internal controls. As a result of the foregoing, Zillow's inventory kept growing and contractors did not complete projects on time or agreed to less projects and this caused houses to sit in inventory longer. When houses sit in Zillow's inventory longer, the cost to Zillow rises.

**The Truth Begins to Emerge**

*October 4, 2021 RBC Capital Markets Lowers Its Price Target for Zillow*

63.     On October 4, 2021, RBC Capital Markets issued an equity research analysis of Zillow. The analysis warned that Zillow would "likely miss[] iBuying expectations in the quarter." Specifically, RBC Capital Markets analyzed Zillow's inventory: "the company likely still has meaningful inventory to work through into Q4 that was bought at too high a price and thus we would expect Q3 results and Q4 guidance to reflect this, as contemplated in our lowered/below-Street Q3 and Q4 estimates. We lower '22E as well on views of stable pricing at the new lower levels." The price target was lowered to $145 from $155.

64.     On October 4, 2021, Zillow's Class A common stock (ZG) price fell to $85.68 per share, a 6.2 % decrease from the previous trading day's closing price. That same day, Zillow's Class C capital stock (Z) price fell to $85.38, a 5.5% decrease from the previous trading day's closing price.

*October 18, 2021 Zillow Pauses Buying of Homes through Zillow Offers*

65.     On October 18, 2021, Zillow issued a press release titled "At Operational Capacity, 'Zillow Offers' to Focus on Signed Customer Contracts and Current Inventory;

Suspends Signing of New Contracts Through 2021." The press release stated "Zillow Offers business will not sign any new, additional contracts to buy homes through the end of the year. Pausing on new contracts will enable Zillow Offers to focus operations on purchasing homes with already-signed contracts, but have yet to close, and reducing the renovation pipeline. Zillow will continue to market and sell homes through Zillow Offers during this period."

66.     On October 18, 2021, Zillow's Class A common stock (ZG) price fell to $85.46 per share, a 9.3% decrease from the previous trading day's closing price. That same day, Zillow's Class C capital stock (Z) price fell to $86 per share, a 9.4% decrease from the previous trading day's closing price.

**The Truth Fully Emerges**
*November 1, 2021 Bloomberg Discussing Zillow's Major Problems*

67.     On November 1, 2021, Bloomberg, among other media companies, published an article titled "Zillow Seeks to Sell 7,000 Homes for $2.8 Billion After Flipping Halt." The article reviewed KeyBanc Capital Markets' analysis of Zillow's inventory: "[a]n analysis of 650 homes owned by Zillow showed that two-thirds were priced for less than the company bought them for, according to an Oct. 31 note from KeyBanc Capital Markets." The article further stated that "The decision [to pause buying] came after the company tweaked the algorithms that power the business to make higher offers, leaving it with a bevy of winning bids just as home-price appreciation cooled off a bit." Bloomberg opined on Zillow's issues regarding not having enough contractors to complete renovations, "the [C]ompany bought more than 3,800 houses in the second quarter, making progress toward its stated goal of acquiring 5,000 homes a month by 2024. The increase in purchases left the company struggling to find workers to renovate the properties." The longer the Company holds onto a house, the more it costs Zillow.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

*November 2, 2021 Press Release*

68.     On November 2, 2021, the Company issued a press release titled "Zillow Group Reports Third-Quarter 2021 Financial Results & Shares Plan to Wind Down Zillow Offers Operations." The Company significantly missed the August 5, 2021 shareholder letter's outlook of total revenue of $1,927 million to $2,047 million and Homes segment revenue of $1,400 million to $1,500 million for the three months ended September 30, 2021. The Company disclosed on November 2, 2021 that the consolidated revenue for the third quarter was $1.7 billion, and Homes segment revenue for the third quarter was $1.2 billion.

69.     Zillow revealed that it would need to recognize an inventory write-down of $304 million in the third quarter, with an expected additional write-down in the fourth quarter of approximately $240 to $265 million (totaling as high as $560 million). The press release stated that the Company would reduce its workforce by 25% as a result of winding down Zillow Offers.

*November 2, 2021 Q3 2021 Earnings Call*

70.     Barton blamed the Company's algorithms and pricing models, stating that "fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in." Barton also blamed labor issues and renovations backlogs that were concealed during the Relevant Period on Zillow Offers wind down:

> We have also experienced significant capacity and demand planning challenges, exacerbated by an admittedly difficult labor and supply chain environment. The combination of these factors has caused a meaningful backup in our processing of homes in the Zillow pipeline, which we announced 2 weeks ago. We judged future significant volume volatility to be a tough impediment to ramp a scaled operation, and any interruptions in the supply chain like we recently experienced will result in increased holding times, further increasing our exposure to volatility and lowering our return on equity.

71.     The Company also pinned some of the blame for the Zillow Offers shutdown on

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

the labor issues and resulting renovations backlog that it had concealed during the Class Period, noting that it had "experienced significant capacity and demand planning challenges," which had "caused a meaningful backup in our processing of homes in [the] Zillow pipeline."

72.     On this news, the Company's stock prices plummeted. On November 3, 2021, Zillow's Class A common stock (ZG) price fell to $65.86, a 22.9% decrease from the previous trading day's closing price. On November 3, 2021, Zillow's Class C capital stock (Z) fell to $65.47, a 24.9% decrease from the previous trading day's closing price.

**Project Ketchup**

73.     On November 17, 2021, *The Wall Street Journal* published an article titled "What Went Wrong With Zillow? A Real-Estate Algorithm Derailed Its Big Bet."[1] The article stated that the Company acknowledged it "was paying too much money for homes, and buying too many of them, just when price increases were starting to slow." The article revealed that Zillow's market capitalization which had "closed at a peak of $48.35 billion in February, is now around $16 billion." Regarding outlook for revenue, *The Wall Street Journal* reported that:

> In the spring, around the time that Zillow started worrying about the accuracy of its algorithm, company executives and managers came together for a tense meeting, according to a person who attended.
>
> As first-quarter numbers trickled in, it became clear that even though it was making more money than anticipated, **the company was on track to significantly miss its annual target for the number of homes it wanted to buy**. Worse, it was falling behind its top competitor, Opendoor.
>
> "This is code red," Joshua Swift, senior vice president of Zillow Offers, said during the virtual meeting, according to the person who attended. Mr. Swift declined to comment through the company.

---

[1] Will Parker, *The Wall Street Journal*, What Went Wrong With Zillow? A Real-Estate Algorithm Derailed Its Big Bet, (Nov. 17, 2021) https://www.wsj.com/articles/zillow-offers-real-estate-algorithm-homes-ibuyer-11637159261 (last visited July 12, 2022).

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 23
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(Emphasis added).

74.    Project Ketchup was born, "a plan to speed up the pace and volume of home purchases, dubbing it Project Ketchup—which employees took as a play on the team's mission to catch up to Opendoor. Zillow planned to buy more homes by spending more money, offering prices well above what its algorithm and analysts picked as market value, people familiar with the matter said." Regarding Zillow's major problems with inventory and renovations, the article stated that:

> In the second quarter, Zillow Offers bought more than 3,800 homes—more than double the previous quarter. In the third quarter, it bought 9,680 homes. The company was buying so many homes that its overstretched staff started running behind on closings and renovations, people familiar with the matter said.
>
> **It struggled to find contractors and renovation materials amid a broader labor and supply shortage. That meant Zillow was in danger of sitting on homes for longer, adding to insurance and debt bills.** It also meant many homes bought during the summer would likely have to be sold in the winter, when the housing market is usually weaker.
>
> Staffers grew concerned Zillow was paying too much, people familiar with the matter said. **Analysts whose job it was to confirm the prices of homes found that they were routinely overruled, those people said, because the company had retooled the system to raise the analysts' suggested prices. Automatic price add-ons coded into the company system, including one called the "gross pricing overlay" that could add as much as 7%, would boost offering prices to get more home sellers to say yes**.

(Emphasis added).

75.    The Individual Defendants created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently-discussed and highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements. Specifically, the statements made were further materially false and misleading because: (i) Zillow management overrode the offer prices generated by Zillow's algorithms and pricing

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 24
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

analysts, and significantly increased the prices Zillow Offers would pay for homes in order to entice more home sellers to accept offers to meet Zillow's volume goals. In the April to May 2021 time frame, Individual Defendants initiated or knew of Project Ketchup to quickly ramp up the purchases of homes; (ii) Individual Defendants claimed operational, unit economic, or renovation "improvements" were the result of non-durable and unsustainable slashing of renovation scopes and the amounts Zillow would pay contractors; (iii) in April or May 2021, Individual Defendants began decreasing the scope of its renovations and the prices it would pay contractors for those renovations; (iv) renovation cost-cutting and the squeeze on contractors came at a time when Zillow was relying on those contractors to quickly renovate a significantly higher volume of houses acquired by overpaying for homes using price overlays and, as a result, Zillow's contractors began deprioritizing Zillow renovations or declining jobs altogether due to Zillow's actions; (vi) the Individual Defendants hid from the stockholders the increased risk it took on by deliberately over-paying for homes well beyond the prices set by its algorithms and analyst pricing; and (vii) the Individual Defendants failed to maintain an adequate system of internal controls. As a result of the foregoing, Zillow's inventory kept growing and contractors did not complete projects on time or agreed to less projects and this caused houses to sit in inventory longer. When houses sit in Zillow's inventory longer, the cost to Zillow rises.

### B.     The False and Misleading Proxy Statement

76.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue a false and misleading proxy statement during the Relevant Period. The Company filed Form

DEF 14A filed with the SEC during the Relevant Period before the truth fully emerged on April 21, 2021 (the "2021 Proxy").[2]

77.     The 2021 Proxy recommended shareholders vote to elect Blachford, Stephenson, and Thielke. The 2021 Proxy also recommended to approve, on an advisory basis, the compensation of named executive officers and the frequency of future advisory votes on the compensation of named executive officers. Regarding the risks of Zillow Offers, the 2021 Proxy states, in relevant part:

> The audit committee provides oversight concerning our major financial risks and the steps management has taken to monitor and control such exposure, including with respect to the capital, regulatory, and other requirements of our Zillow Offers, Zillow Home Loans, and Zillow Closing Services businesses, and data privacy, cybersecurity, and other topics related to our information technology infrastructure. Each committee generally reports on its deliberations to the full Board during the committee reports portion of the next Board meeting. This enables the Board and its committees to coordinate their risk oversight roles.

78.     If the Audit Committee Defendants were overseeing Zillow Offers' operations, the Company's inventory would not have become so high that buying had to be paused. Alternatively, the Audit Committee Defendants did know of the ongoing problems with Zillow Offers and chose not to disclose it to stockholders.

79.     The 2021 Proxy emphasized the success of Zillow Offers:

> [I]n September 2020, we announced that beginning in January 2021, customers in certain markets who sell homes through Zillow Offers will work directly with trusted, licensed employees of Zillow Homes, a licensed brokerage entity. Zillow-owned homes in these markets are listed for sale by licensed Zillow Homes employees. We expect to expand these services to additional Zillow Offers markets later in 2021…in 2020, Homes segment revenue grew to

---

[2] These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

$1,715.4 million for the year ended December 31, 2020, due to the sale of 5,337 homes through our Zillow Offers business, which began selling homes in July of 2018. As of December 31, 2020, Zillow Offers and Zillow Closing Services were operating in 25 metropolitan areas…

80.     The 2021 Proxy did not disclose, however, the major inventory problem in Zillow Offers and how that affected the Company's operations.

81.     Additionally, the 2021 Proxy contained an Audit Committee Report which stated the following, in relevant part:

(i)     The audit committee has reviewed and discussed the audited financial statements for fiscal year 2020 with Zillow Group's management.

(ii)     The audit committee has discussed with Deloitte, the Company's independent registered public accounting firm, the matters required to be discussed by the statement on Auditing Standard No. 1301, and Rule 2-07 of Regulation S-X, Communications with Audit Committees.

(iii)     The audit committee has received the written disclosures and the letter from Deloitte, the Company's independent registered public accounting firm, required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm's communications with the audit committee concerning independence, and has discussed with the independent registered public accounting firm the independent registered public accounting firm's independence.

(iv)     Based on the review and discussion referred to in paragraphs (i) through (iii) above, the audit committee recommended to Zillow Group's Board of Directors that the audited financial statements be included in Zillow Group's Annual Report on Form 10-K for the year ended December 31, 2020, for filing with the SEC.

82.     The 2021 Proxy was false and misleading because, while it assured investors that it would keep stockholders informed and that its Audit Committee reviewed filings, including the 2020 10-K, that was not the case as revealed by Zillow's October 18, 2021 press release. The October 18, 2021 press release revealed the major operational issues with inventory from Zillow Offers and that the Individual Defendants allowed each other and the Company to issue false and materially misleading statements during the Relevant Period. The

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Individual Defendants also recommended shareholders elect directors during the Blachford, Stephenson, and Thielke.

## V.    FIDUCIARY DUTIES

83.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Zillow and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Zillow in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Zillow and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

84.    Each Individual Defendant owes and continues to owe Zillow, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

85.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zillow, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Zillow, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

86.    To discharge their duties, the Individual Defendants were/are required to

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)      ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)      conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)      remain informed as to how Zillow conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)      truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**C.      Duties Pursuant to the Company's Corporate Governance Guidelines, Code of Conduct, and Code of Ethics**

87.      The Individual Defendants, as officers and/or directors of Zillow, were bound by the Company's Corporate Governance Guidelines[3] which required directors to "abide by the relevant provisions of the Company's Code of Conduct and Code of Ethics." Regarding reporting of violations and keeping accurate books and records, the Company's Code of

---

[3] *See* Zillow's Corporate Governance Guidelines: https://s24.q4cdn.com/723050407/files/doc_downloads/governance/Zillow-Corporate-Governance-Guidelines-March-2022.pdf.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 29
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Conduct[4] states:

> Every person subject to this Code should endeavor to deal honestly, ethically and fairly with the Company's consumers, customers, suppliers, competitors and employees. Statements regarding the Company's products and services must not be false, misleading, deceptive or fraudulent. No person subject to this Code may take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.
>
> ***
>
> If any person subject to this Code becomes aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is such person's responsibility to follow the guidelines described in the Reporting and Compliance Procedures section below to promptly report the matter to such person's supervisor or the General Counsel or, if you are an executive officer or director, to the Chair of the Nominating and Governance Committee of the Board of Directors of Zillow Group, Inc.
>
> ***
>
> All Company books, records and accounts shall be maintained in accordance with all applicable regulations and binding standards and accurately reflect the true nature of the transactions they record. Each person subject to this Code must follow any formal document retention policy of the Company with respect to Company records within such person's control. The financial statements of Zillow Group, Inc. shall conform to generally accepted accounting principles and the Company's accounting policies. All cash, bank accounts, investments and other assets always must be recorded in the official books of the Company. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.
>
> ***
>
> The Company files reports and other documents with regulatory authorities, which may include the United States Securities and Exchange Commission and NASDAQ. The Company may make other public communications, such as

---

[4] *See* Zillow's Code of Conduct: https://s24.q4cdn.com/723050407/files/doc_downloads/governance/Policy_Code_of_Conduct.pdf.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 30
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2   issuing press releases. All information provided in the Company's public reports

3   and communications must be complete, fair, accurate, timely and
    understandable, and must also comply with applicable laws, rules and

4   regulations. Employees, officers and directors who are asked to provide
    information for the Company's public disclosures must use all reasonable efforts

5   to provide complete, fair, accurate, timely and understandable information.

6       88.     Regarding compliance procedures, the Code of Conduct required the following:

7   Every person subject to this Code has the responsibility to ask questions, seek

8   guidance, report suspected violations and express concerns regarding
    compliance with this Code. Any person subject to this Code who knows or

9   believes that any other employee or representative of the Company has engaged
    or is engaging in Company-related conduct that violates applicable law or this

10  Code should report such violation to at least one of the following contacts:

11  • Human Resources
    • General Counsel

12  • Chief Executive Officer

13  • Chief Financial Officer
    • Nominating and Governance Committee Chairman

14  • Audit Committee Chairman

15      89.     Regarding insider trading, the Code of Conduct stated the following:

16  **Employees, officers and directors who are in possession of material non-**

17  **public information about the Company or other companies, including the**
    **Company's suppliers and customers, as a result of their relationship with**

18  **the Company are prohibited by law and Company policy from trading in**
    **securities of the Company or such other companies**, as well as from

19  communicating such information to others who might trade on the basis of that
    information. To assist with compliance with laws against insider trading, the

20  Company has adopted a detailed Insider Trading Policy.

21
    (Emphasis added).
22

23      90.     The Individual Defendants failed to adhere to the Code of Conduct when they

24  failed to promptly disclose the major problems with Zillow Offers and traded stock based on

25  material adverse non-public information.

26      91.     The Company's Insider Trading Policy is not available on the Company's

27  website with the other corporate governance documents. The 2021 Proxy states that the

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 31
(NO. )

Company has established an insider trading compliance policy that applies to directors, executives, and employees.

92.    The Company's Code of Ethics[5] requires that Zillow's CEO, CFO, principal accounting officer, and controller promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and other public communications made by the Company; and

- Compliance with governmental laws, rules and regulations applicable to the Company.

93.    The Code of Ethics further states that "[p]ersons who become aware of suspected violations of this Code should report such suspected violations promptly to the Chair of the Audit Committee of the Zillow Group, Inc. Board of Directors (the 'Audit Committee' and the 'Board of Directors', respectively), who will forward such report to the Audit Committee."

94.    In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to Zillow under the Audit Committee Charter (the "Audit Charter").[6] Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee Defendants:

---

[5] *See* Zillow's Code of Ethics:
https://s24.q4cdn.com/723050407/files/doc_downloads/governance/Z_COE.pdf.

[6] *See* Zillow's Audit Charter at:
https://s24.q4cdn.com/723050407/files/doc_downloads/committee_charters/2022/Zillow-Audit-Committee-Charter-March-2022.pdf.

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 32
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2    Prior to filing any periodic report with the SEC, meet with management and the
     independent auditor to review and discuss the annual audited financial
3    statements (including the report of the independent auditor thereon) and
     quarterly unaudited financial statements, including in each case the Company's
4    disclosures under "Management's Discussion and Analysis of Financial
     Condition and Results of Operations."

5    Regularly review with the independent auditor any audit problems or difficulties
6    and management's response, including any restriction on the scope of activities,
     access to required information, the adequacy of internal controls, adjustments
7    noted or proposed by the independent auditor but not taken (as immaterial or
     otherwise) by management, communications between the audit team and the
8    national office concerning auditing or accounting issues, and any management
     or internal control letters issued or proposed to be issued by the auditor.

9
         95.    Regarding accounting practices and policies and risk and risk management, the
10
     Code of Ethics states, in relevant part:
11

12   Review at least annually (a) major issues regarding accounting principles and
     financial statement presentations, including any significant changes in the
13   Company's selection or application of accounting principles, and major issues as
     to the adequacy of the Company's internal controls and any special audit steps
14   adopted in light of material control deficiencies, (b) analyses prepared by
     management and/or the independent auditor setting forth significant financial
15   reporting issues and judgments made in connection with the preparation of the
     financial statements, and (c) the effect of regulatory and accounting initiatives
16   on the financial statements of the Company.

17   Review and discuss with management from time to time the effectiveness of, or
     any deficiencies in, the design or operation of disclosure controls and procedures
18   or internal controls and any fraud, whether or not material, that involves
     management or other employees who have a significant role in the Company's
19   internal controls. Review any report issued by the Company's independent
     auditor regarding management's assessment of the Company's internal controls.

20   Discuss policies with respect to risk assessment and risk management, including
21   the Company's major financial risk exposures, including capital, regulatory and
     other requirements, and data privacy, cybersecurity and other topics related to
22   information technology infrastructure, and the steps management has taken to
     monitor and control such exposures.

23       96.    Regarding the Audit Committee Report in the Company's proxy statements,
24
     persons who are bound by the Code of Ethics must "[a]pprove the Audit Committee Report
25
     required by the rules of the SEC to be included in the Company's annual proxy statement."
26
         97.    The Individual Defendants failed to adhere to the Code of Conduct and Code of
27

Ethics by issuing false and materially misleading public statements and filings with the SEC related to Zillow Offers. Furthermore, the Audit Committee Defendants failed to uphold their duties required by the Audit Charter by allowing the Company to issue materially false and misleading statements regarding the accuracy of the Company's disclosures regarding Zillow Offers.

## VI.   BREACHES OF DUTIES

98.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Zillow, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

99.   The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding Zillow Offers as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Zillow substantial damage.

100.   The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Zillow's public statements and internal control function.

101.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of Zillow, were able to and did, directly or indirectly, exercise control

over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Zillow has expended, and will continue to expend, significant sums of money.

## VII.   DAMAGES TO ZILLOW

102.   The materially false and misleading statements has exposed the Company to myriad reputational and financial damages, including but not limited to:

(a)      Possible restatements and goodwill impairments;

(b)      Hundreds of millions in inventory write-downs;

(c)      The destruction of Zillow Offers;

(d)      The loss of 25% of Zillow's workforce;

(e)      Liability arising from the Federal Securities Class Action;

(f)       The loss of credibility with customers and suppliers; and

(g)      Legal costs associated with litigation, investigations, and restatements.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.   Plaintiff brings this action derivatively and for the benefit of Zillow to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zillow, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

104.   Zillow is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

105.   Plaintiff is, and has been continuously at all relevant times, a stockholder of Zillow. Plaintiff will adequately and fairly represent the interests of Zillow in enforcing and

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 35
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

106.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

107.    A pre-suit demand on the Board of Zillow is futile and, therefore, excused. At the time of filing this action, the Board consists of Individual Defendants Barton, Blachford, Bohutinsky, Thielke, Frink, Hoag, Maffei, Stephenson, and Underwood (the "Director Defendants"). Plaintiff needs only to allege demand futility as to a majority (five) of the Directors who are on the Board at the time this action is commenced.

108.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

109.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

*Barton*

110.    Demand on Barton is futile because Barton has served as a Company director

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 36
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

since 2004. Barton currently serves as CEO and is a co-founder of Zillow. Barton received a material personal benefit in the form of insider trading that would be the subject of a litigation demand. Barton's sales during the Relevant Period totaled over $85 million.

111.    The Company admits in the latest proxy statement filed April 28, 2022 (the "2022 Proxy") that Barton is not an independent director. According to the 2022 Proxy, Barton received $20.9 million in compensation for the fiscal year ended December 31, 2021. Barton signed the 2021 Proxy, the 2020 10-K, and SOX certifications for the May 4, 2021 10-Q and August 5, 2021 10-Q which contained materially false and misleading statements and therefore faces a substantial likelihood of liability.

112.    Additionally, Barton will not bring a suit against the Individual Defendants because it would harm his investment in the Company. As of April 5, 2021, Barton owned 4.1 million shares of Class A common stock, 3.7 million shares of Class B common stock, and 7.4 million shares of Class C Capital stock. Barton is also a named defendant in the Federal Securities Class Action.

113.    Barton also lacks independence from Frink because of transactional and personal ties. Barton and Frink are co-founders of Zillow. Stanford Magazine published an article in 2015 that stated "Barton and Frink are close friends outside the office. Their families enjoy activities together, and Barton and Frink have attended the Burning Man arts and music festival for the past several years. They ski together, and Frink is working on luring Barton onto the golf links for a good walk spoiled. They share tickets to the Seattle Seahawks and Seattle Sounders games."[7] According to the article, Barton and Frink became friends while at Expedia.

---

[7] Greg Scheiderer, Ammo For The House Hunt, Stanford Magazine, July/August 2015, https://stanfordmag.org/contents/ammo-for-the-house-hunt (last visited July 11, 2022).

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 37
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

They also worked together at Microsoft and even shared an office. The 2022 Proxy stated that Barton served as a venture partner at Benchmark, a venture capital firm, from February 2005 through September 2018. Frink has served as a director on Grubhub Inc. since 2013. On November 15, 2010, Grubhub Inc. issued a press release title "GrubHub Secures $11 million in Investment Led by Benchmark Capital."

114.    Barton lacks independence from Maffei because the two serve as directors on Qurate Retail, Inc. ("Qurate"). Maffei is Qurate's Chairman and has served as a director since 2005. Barton has served as a director of Qurate since 2016. In addition to being Qurate's Chairman, Maffei also owns 19.8% of Qurate's voting power. Barton received $244,786 in 2021 for his role as a director of Qurate.

115.    Barton lacks independence from Hoag because the two serve as directors of Netflix, Inc. ("Netflix"). Barton has served as a director of Netflix since 2002 and Hoag has served as a director of Netflix since 1999. As Chair of Netflix's Nominating and Governance Committee, Hoag holds significant influence over Barton's status as a director of Netflix. Barton received $350,675 in compensation during 2021 for his role as a director of Netflix.

116.    Barton lacks independence from Blachford because of transactional ties. According to the 2022 Proxy, Barton and Blachford "are 50% co-owners of a condominium." The 2022 Proxy also states that Barton and Blachford "have an arrangement pursuant to which Mr. Barton is expected to purchase up to all of Mr. Blachford's limited partnership interest in one or more TCV investment funds."

117.    Barton shares transactional ties with Hoag, Wacksman, Maffei, Blachford, and Bohutinsky in TCV, a private equity and venture capital firm. According to the 2022 Proxy, Hoag is the general partner of TCV and is a "direct or indirect director, limited partner, or

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

member of the general partners of various private equity and venture capital funds of TCV" that were invested in by Barton, Wacksman, Maffei, Blachford, and Bohutinsky. Further, Blachford "has and may continue to consult as an executive advisor and venture partner of TCV until such time as his limited partnership interest in one or more TCV investment funds is transferred to Mr. Barton, which is expected to occur in 2022 through one or more transactions[.]" Bohutinsky, as a venture partner of TCV, "may also provide certain consulting or other services to TCV from time to time, for which she may receive indirect economic interests or value in certain investments by TCV's affiliated investment funds."

118.    Barton knew or should have known that Zillow Offers was creating significant losses for the Company. He either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

119.    For these reasons, Barton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Blachford**

120.    Demand on Blachford is futile because Blachford has served as a Company director since 2005. Blachford received a material personal benefit in the form of insider trading that would be the subject of a litigation demand. The Form 4 did not indicate Blachford's sales were made pursuant to a 10b5-1 trading plan. Blachford reaped over $2.3 million in sales proceeds.

121.    Blachford is incentivized to not bring suit for the misconduct alleged herein because it would significantly impact his investment in the Company. According to the 2022 Proxy, he owns 49 thousand shares of Class A common stock and 113 thousand shares of Class

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 39
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

C capital stock. He has received and continues to receive compensation for his role as a director as described herein. Blachford signed and thus personally made the false and misleading statements in the 2020 10-K. Blachford further benefited from the false and misleading 2021 Proxy because he was re-elected as a result.

122.   Blachford shares transactional ties with Hoag, Wacksman, Maffei, Barton, and Bohutinsky in TCV, as stated above. Blachford further lacks independence from Hoag because they both served together as directors of Peloton Interactive, Inc. ("Peloton"). Blachford served as a director of Peloton from 2015 until February 5, 2022. Hoag has served as a director of Peloton since 2018. According to Peloton's proxy statement filed October 25, 2021, entities affiliated with TCV hold 37.5% of Peloton's total voting power.

123.   As stated previously, Blachford further lacks independence from Barton because of their longstanding friendship and co-ownership in a condominium.

124.   Blachford knew or should have known that Zillow Offers was creating significant losses for the Company. He either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

125.   For these reasons, Blachford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

*Bohutinsky*

126.   Demand on Bohutinsky is futile because Bohutinsky has served as a Company director since 2018. She previously served as the Company's Chief Operating Officer from August 2015 until January 2019; Chief Marketing Officer from March 2011 until August 2015; Vice President of Marketing and Communications from September 2010 until March 2011;

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Vice President of Communications from August 2008 until September 2010; and Director of Communications from August 2005 until August 2008. The Company's 2021 Proxy stated that Bohutinsky is not an independent director. Bohutinsky signed and thus personally made the false and misleading statements in the 2020 10-K. Bohutinsky also faces a substantial likelihood of liability for authorizing the 2021 Proxy.

127.    According to the 2022 Proxy, she owns 31 thousand shares of Class A common stock and 215 thousand shares of Class C capital stock. Therefore, Bohutinsky will not bring a suit against the Individual Defendants because it would harm her investment in the Company. She has received and continues to receive compensation for her role as a director as described herein.

128.    Bohutinsky shares transactional ties with Hoag, Wacksman, Maffei, Barton, and Blachford in TCV, as stated above.

129.    Bohutinsky knew or should have known that Zillow Offers was creating significant losses for the Company. She either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

130.    For these reasons, Bohutinsky breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

*Thielke*

131.    Demand on Thielke is futile because Thielke has served as a Company director since 2020. She has received and continues to receive compensation for her role as a director and is a member of the Audit Committee. Thielke signed and thus personally made the false and misleading statements in the 2020 10-K. She also faces a substantial likelihood of liability

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 41
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

for authorizing the 2021 Proxy.

132.   According to the 2022 Proxy, she owns 7.9 thousand shares of Class C capital stock. Therefore, Thielke will not bring a suit against the Individual Defendants because it would harm her investment in the Company.

133.   She has received and continues to receive compensation for her role as a director as described herein. Thielke also benefited from the false and misleading 2021 Proxy because she was re-elected through it.

134.   Thielke knew or should have known that Zillow Offers was creating significant losses for the Company. She either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company. As a member of the Audit Committee, Thielke failed to uphold her additional duties to ensure a system of internal controls was maintained.

135.   For these reasons, Thielke breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

***Frink***

136.   Demand on Frink is futile because Frink has served as a director of the Company since 2004. He has served as Executive Chairman since 2019, co-founded the Company with Barton, and is President of the Company. Frink signed and thus personally made the materially false and misleading statements in the 2020 10-K. He also faces a substantial likelihood of liability for authorizing the 2021 Proxy.

137.   According to the 2022 Proxy, Frink owns 3.2 million shares of Class A common stock, 2.4 million shares of Class B common stock, and 4.4 million shares of Class C capital stock. Therefore, Frink will not bring a suit against the Individual Defendants because it would

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 42
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

harm his investment in the Company.  Frink controls 20.1% of the Company's voting power.

138.    The 2022 Proxy states that Frink is not an independent director and that he received $16.9 million in compensation from the Company during 2021.

139.    Frink knew or should have known that Zillow Offers was creating significant losses for the Company. He either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

140.    As stated above as to why demand is futile to Barton, Frink and Barton share long-standing personal and business relationships, including Benchmark Capital Investments' investment in Grubhub Inc. Thus, Frink lacks independence from Barton.

141.    For these reasons, Frink breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

*Hoag*

142.    Demand on Hoag is futile because Hoag has served as a Company director since 2005. He has received and continues to receive compensation for his role as a director. Hoag signed and thus personally made the false and misleading statements in the 2020 10-K. He also faces a substantial likelihood of liability for authorizing the 2021 Proxy.

143.    According to the 2022 Proxy, Hoag owns 516 thousand shares of Class A common stock and 5.9 million shares of Class C capital stock. Therefore, Hoag will not bring a suit against the Individual Defendants because it would harm his investment in the Company.

144.    Hoag knew or should have known that Zillow Offers was creating significant losses for the Company. He either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

145.    As stated above, Hoag is disinterested from Barton because they both serve on Netflix's board of directors. Hoag shares transactional ties with Bohutinsky, Wacksman, Maffei, Barton, and Blachford in TCV. As stated previously, Hoag serves on Peloton's board of directors which entities affiliated with TCV hold 37.5% of the total voting power.

146.    Hoag further lacks independence from Maffei because they serve together on Tripadvisor, Inc.'s ("Tripadvisor") board of directors. According to the 2022 Proxy, "Maffei is also the Chief Executive Officer and Chairman of the Board of Liberty TripAdvisor Holdings, which currently holds approximately a 21.4% equity interest and 57.3% voting interest in TripAdvisor, Inc." Maffei also serves on Tripadvisor's compensation committee. According to Tripadvisor's proxy statement filed April 29, 2022, Hoag received $314,983 in compensation from Tripadvisor for his role as a director. Thus, Hoag lacks independence from Bohutinsky, Wacksman, Maffei, Barton, and Blachford.

147.    For these reasons, Hoag breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

*Maffei*

148.    Demand on Maffei is futile because Maffei has served as a Company director since 2005. Maffei received a material personal benefit in the form of insider trading that would be the subject of a litigation demand. The Form 4 did not indicate Maffei's sale was made pursuant to a 10b5-1 trading plan. Maffei reaped over $380 thousand in sales proceeds.

149.    Maffei has received and continues to receive compensation for his role as a director as described herein and is the Chairman of the Audit Committee. Maffei signed and thus personally made the false and misleading statements in the 2020 10-K. He also faces a

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

substantial likelihood of liability for authorizing the 2021 Proxy.

150.    According to the 2022 Proxy, he owned 316 thousand shares of Class A common stock and 705 thousand shares of Class C capital stock. Therefore, Maffei will not bring a suit against the Individual Defendants because it would harm his investment in the Company.

151.    Maffei knew or should have known that Zillow Offers was creating significant losses for the Company. He either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company. As Chairman of the Audit Committee, Maffei failed to uphold his additional duties to ensure a system of internal controls was maintained.

152.    As stated above, Maffei lacks independence from Barton because they serve together on Qurate's board of directors; Maffei lacks independence from Hoag because they serve together on Tripadvisor's board of directors. Hoag serves on Tripadvisor's compensation committee. During 2021, Maffei received $314,983 in compensation for his role as a director of Tripadvisor. Maffei shares transactional ties with Bohutinsky, Wacksman, Hoag, Barton, and Blachford in TCV.

153.    For these reasons, Maffei breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

*Stephenson*

154.    Demand on Stephenson is futile because Stephenson has served as a Company director since 2005. Stephenson received a material personal benefit in the form of insider trading that would be the subject of a litigation demand. The Form 4 did not indicate Stephenson's sale was made pursuant to a 10b5-1 trading plan. Stephenson reaped over $1.9

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 45
(NO. )

million in sales proceeds.

155.    Stephenson has received and continues to receive compensation for his role as a director as described herein and serves as a member of the Audit Committee. Stephenson signed and thus personally made false and misleading statements in the 2020 10-K. He also faces a substantial likelihood of liability for authorizing the 2021 Proxy and benefited from re-election through the 2021 Proxy.

156.    According to the 2022 Proxy, Stephenson owns 41 thousand shares of Class A common stock and 144 thousand shares of Class C capital stock. Therefore, Stephenson will not bring a suit against the Individual Defendants because it would harm his investment in the Company.

157.    Stephenson knew or should have known that Zillow Offers was creating significant losses for the Company. He either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company. As a member of the Audit Committee, Stephenson failed to uphold his additional duties to ensure a system of internal controls was maintained.

158.    According to the 2022 Proxy, "Stephenson participates in Zillow Group's Premier Agent program, a business relationship that has been an ordinary course dealing." According to an article published by *Inman*, Stephenson accumulated $10 million in wealth from March 2014 through March 2015 through being a Zillow Premier Agent.[8] According to the article, Stephenson "met Rich Barton through a Stanford classmate, Christian Acker, who was Barton's first hire at Zillow." According to Stephenson's profile on Zillow's website, he

---

[8] Brad Inman, How this Zillow Premier Agent made $10 million, Inman, March 5, 2015, https://www.inman.com/2015/03/05/how-this-zillow-premier-agent-made-10-million/ (last visited July 11, 2022).

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

currently has eighteen listings ranging from $475,000 to $2,900,000.[9] His profile also lists that he sold 171 homes in 2022 alone. The homes sold in 2022 so far had an aggregate closing price of approximately $143 million. Therefore, Stephenson derives a substantial source of his income from his status as a Zillow Group Premier Agent. Barton as and Frink as the Company's upper management can influence whether Stephenson retains his status as a Zillow Group Premier Agent. Therefore, Stephenson lacks independence from Barton and Frink.

159.    For these reasons, Stephenson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Underwood**

160.    Demand on Underwood is futile because Underwood has served as a Company director since 2017. She has received and continues to receive compensation for her role as a director as described herein. Underwood signed and thus personally made the false and misleading statements in the 2020 10-K. She also faces a substantial likelihood of liability for authorizing the 2021 Proxy.

161.    According to the 2022 Proxy, Underwood owns 48 thousand shares of Class C capital stock. Therefore, Underwood will not bring a suit against the Individual Defendants because it would harm his investment in the Company.

162.    Underwood knew or should have known that Zillow Offers was creating significant losses for the Company. She either did investigate and knew or failed to investigate the damages Zillow Offers caused the Company.

163.    For these reasons, Underwood breached her fiduciary duties, faces a substantial

---

[9] *See* https://www.zillow.com/profile/Gordon (last visited July 11, 2022).

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 47
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

164.    As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

165.    Pursuant to the Company's Audit Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

166.    In violation of the Code of Conduct and Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 48
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Exchange Act. In further violation of the Code of Conduct and Code of Ethics, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct and Code of Ethics. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

167.    Zillow has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zillow any part of the damages Zillow suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

168.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

169.    The acts complained of herein constitute violations of fiduciary duties owed by Zillow's officers and directors, and these acts are incapable of ratification.

170.    Thus, for all the reasons set forth above, all the Director Defendants, and, if not

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

all of them, at least a majority of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## IX.    FIRST CLAIM
### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

173.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

174.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

false or misleading." 17 C.F.R. § 240.14a-9.

175.    The 2021 Proxy also stated that the Company's directors and employees are subject to the Company's Code of Conduct and Code of Ethics.  The 2021 Proxy was also false and misleading because, despite assertions to the contrary, Zillow's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

176.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2021 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

177.    The false and misleading elements of the 2021 Proxy led to the re-elections of Blachford, Stephenson, and Thielke, allowing them to continue breaching their fiduciary duties to Zillow.

178.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 Proxy.

179.    Plaintiff, on behalf of Zillow, has no adequate remedy at law.

## X.    SECOND CLAIM
### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    The Individual Defendants, by virtue of their positions with Zillow and their

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 51
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

specific acts, were, at the time of the wrongs alleged herein, controlling persons of Zillow and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Zillow to engage in the misconduct and practices complained of herein.

182.   Plaintiff, on behalf of Zillow, has no adequate remedy at law.

## XI.   THIRD CLAIM
### Against Individual Defendants
*for Breach of Fiduciary Duties*

183.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zillow's business and affairs.

185.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

186.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zillow.

187.   In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

188.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

189.   Also, in breach of their fiduciary duties, the Individual Defendants willfully or

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 52
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that Zillow was on track to continue to receive revenue from Zillow Offers. The Company's August 5, 2021 shareholder letter gave an outlook of total revenue of $1,927 million to $2,047 million and Homes segment revenue of $1,400 million to $1,500 million for the three months ended September 30, 2021. Yet the Company disclosed on November 2, 2021 that the Company was winding down Zillow Offers, consolidated revenue for the third quarter was $1.7 billion, and Homes segment revenue for the third quarter was $1.2 billion.

190. The Individual Defendants created a false and misleading impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently-discussed and highlighted algorithm and pricing models and that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements. Specifically, the statements made were further materially false and misleading because: (i) Zillow management overrode the offer prices generated by Zillow's algorithms and pricing analysts, and significantly increased the prices Zillow Offers would pay for homes in order to entice more home sellers to accept offers to meet Zillow's volume goals. In the April to May 2021 time frame, Individual Defendants initiated or knew of Project Ketchup to quickly ramp up the purchases of homes; (ii) Individual Defendants claimed operational, unit economic, or renovation "improvements" were the result of non-durable and unsustainable slashing of renovation scopes and the amounts Zillow would pay contractors; (iii) in April or May 2021, Individual Defendants began decreasing the scope of its renovations and the prices it would pay contractors for those renovations; (iv) renovation cost-cutting and the squeeze on contractors came at a time when Zillow was relying on those contractors to quickly renovate a significantly

higher volume of houses acquired by overpaying for homes using price overlays and, as a result, Zillow's contractors began deprioritizing Zillow renovations or declining jobs altogether due to Zillow's actions; (vi) the Individual Defendants hid from the stockholders the increased risk it took on by deliberately over-paying for homes well beyond the prices set by its algorithms and analyst pricing; and (vii) the Individual Defendants failed to maintain an adequate system of internal controls. As a result of the foregoing, Zillow's inventory kept growing and contractors did not complete projects on time or agreed to less projects and this caused houses to sit in inventory longer. When houses sit in Zillow's inventory longer, the cost to Zillow rises.

191.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

192.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

193.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 54
(NO. )

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

194.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

195.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zillow has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

196.    Plaintiff, on behalf of Zillow, has no adequate remedy at law.

## XII.    FOURTH CLAIM
### Against Individual Defendants
*for Unjust Enrichment*

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Zillow.

199.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Zillow tied to the performance or

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

artificially inflated valuation of Zillow, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

200.    Plaintiff, as a stockholder and a representative of Zillow, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

201.    Plaintiff, on behalf of Zillow, has no adequate remedy at law.

## XIII.    FIFTH CLAIM
**Against Individual Defendants**
*for Waste of Corporate Assets*

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Zillow will lose financing from investors and business from future customers who no longer trust the Company and its services.

204.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

205.    Plaintiff, on behalf of Zillow, has no adequate remedy at law.

## XIV.    SIXTH CLAIM
**Against Defendants Barton, Blachford, Maffei, Stephenson, Parker, Wacksman, Spaulding, Prawer, Johnson, Daimler, and Beitel**
*for Insider Trading*

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

207.   When Defendants Barton, Blachford, Maffei, Stephenson, Parker, Wacksman, Spaulding, Prawer, Johnson, Daimler, and Beitel sold over $116 million worth of stock, they were in possession of material non-public information regarding the Company's true organic growth from Zillow Offers and Project Ketchup's artificial effects on the Company's financial results, both of which would have an adverse effect on the stock price. The revelation of this adverse information and the full truth concerning Zillow Offers' growth would destroy billions in market capitalization and cause the Company to write down losses of more than half a billion dollars when revealed to the market.

208.   The foregoing information was proprietary, material, adverse, and non-public information regarding the Company's operations known only by Zillow insiders. The information which formed the basis of the sales of stock made by Defendants Barton, Blachford, Maffei, Stephenson, Parker, Wacksman, Spaulding, Prawer, Johnson, Daimler, and Beitel was the type of information upon which they were specifically barred from trading. This information was a proprietary asset belonging to Zillow, which was usurped for the benefit of Defendants Barton, Blachford, Maffei, Stephenson, Parker, Wacksman, Spaulding, Prawer, Johnson, Daimler, and Beitel and to the detriment of the Company.

209.   The use of this information by Defendants Barton, Blachford, Maffei, Stephenson, Parker, Wacksman, Spaulding, Prawer, Johnson, Daimler, and Beitel was a breach of their fiduciary duty of loyalty. Their insider sales of stock were predicated upon their possession of material, adverse, non-public information to which they had access as Zillow insiders.

210.   Plaintiff, on behalf of Zillow, has no adequate remedy at law.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

## XV.    PRAYER FOR RELIEF

211.    **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Zillow, and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to Zillow;

C.    Determining and awarding to Zillow the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing Zillow and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Zillow and its stockholders from a repeat of the damaging events described herein;

E.    Awarding Zillow restitution from Individual Defendants;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court may deem just and proper.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2      DATED July 20, 2022.

3                                        BRESKIN JOHNSON & TOWNSEND PLLC

4                                        By:  _s/ Roger Townsend_
                                              Roger M. Townsend, WSBA No. 25525
5                                             1000 Second Avenue, Suite 3670
                                              Seattle, WA  98104
6                                             Phone:  206-652-8660
                                              Facsimile:  206-652-8290
7                                             rtownsend@bjtlegal.com

8                                        LEVI & KORSINSKY, LLP

9                                             Gregory M. Nespole, *pro hac vice* anticipated
                                              Ryan Messina, *pro hac vice* anticipated
10                                            55 Broadway, 10th Floor
                                              New York, NY  10006
11                                            Phone: (212) 363-7500
                                              Facsimile: (212) 363-7171
12                                            gnespole@zlk.com
                                              rmessina@zlk.com
13

14                                       *Attorneys for Plaintiff Michael Blake Randolph*

15

16

17

18

19

20

21

22

23

24

25

26

27

VERIFIED STOCKHOLDER DERIVATIVE
COMPLAINT - 59
(NO. )